UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE:                                        )
                                              )
                                              )   Case No. 25-18572
NORTH AMERICAN BUILDERS SUPPLY, INC, )
                                              )   Honorable Jacqueline P. Cox
                                              )
            Debtor                            )   Chapter 11

## APPLICATION OF DEBTOR, NORTH AMERICAN BUILDERS SUPPLY, INC., TO SET HEARING ON EMERGENCY MOTION

NOW COMES the Debtor, North American Builders Supply, Inc. ("Debtor"), by and through its attorney, Joel A. Schechter of the Law Offices of Joel A. Schechter, and pursuant to Local Bankruptcy Rule 9013-2 requests the Court set a hearing on Debtor's Emergency Motion ("Emergency Motion") for Approval of a Pre-Petition Factoring and Security Agreement with OGF Capital LLC ("OGF") and in support thereof, states as follows:

1.     On December 3, 2025, the Debtor filed a voluntary petition pursuant to Chapter 11 of Title 11, United States Code ("Case").

2.     The Debtor is an Illinois corporation that is engaged in the retail sale of building materials consisting of lumber, windows, doors, trim and hardware to commercial and residential builders.

3.     Prior to the filing of the Case, on or about September 17, 2025, the Debtor and OGF entered into a Factoring and Security Agreement whereby OGF purchased accounts receivable generated by the Debtor in connection with its business.  A copy of the Factoring and Security Agreement is appended as an exhibit to the Emergency Motion.

4.      The Debtor has no other sources of working capital and it is in the best interest of creditors of the bankruptcy estate for the Debtor to continue working with OGF so that OGF will purchase accounts receivable generated by the Debtor and immediately fund the Debtor's bank account with the amount provided pursuant to the Factoring and Security Agreement in exchange for the sale and assignment by the Debtor to OGF of its accounts receivable as the same are generated.

5.      The Debtor has ongoing expenses of its business including, but not limited to, purchase of materials, insurance expenses and related business expenses to keep the Debtor operating so as to generate income to fund a plan of reorganization.

6.      It is necessary for the Court to hear this matter as an emergency at the earliest opportunity to prevent serious and irreparable harm to the Debtor's operations if it is not authorized to maintain and continue the Factoring and Security Agreement with OGF. The Debtor requests the Emergency Motion be set for hearing on Monday, December 8, 2025, or at the earliest opportunity of the Court.

7.      Appended to this application is a copy of the Emergency Motion with exhibits referenced.

WHEREFORE, for the reasons stated herein, the Debtor, North American Builders Supply, Inc., hereby requests the Court grant its request for emergency hearing on the Emergency Motion and for such other and further relief as the Court may deem just and proper.

Respectfully submitted,

North American Builders Supply, Inc.,
Debtor

By:  /s/ Joel A. Schechter
        Its Attorney

Case 25-18572   Doc 3   Filed 12/04/25   Entered 12/04/25 16:22:57   Desc Main
Document      Page 3 of 39

Joel A. Schechter
Attorney No. 3122099
LAW OFFICES OF JOEL A. SCHECHTER
53 W. Jackson Blvd., Suite 860
Chicago, Illinois   60604
(312) 332-0267
joel@jasbklaw.com

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| | ) | Case No. 25-18572 |
| NORTH AMERICAN BUILDERS SUPPLY, INC, | ) | |
| | ) | Honorable Jacqueline P. Cox |
| | ) | |
| Debtor | ) | Chapter 11 |

## DEBTOR'S EMERGENCY MOTION FOR APPROVAL OF A PRE-PETITION FACTORING AND SECURITY AGREEMENT WITH OGF CAPITAL LLC

NOW COMES North American Builders Supply, Inc. ("Debtor"), by and through its attorney, Joel A. Schechter of the Law Offices of Joel A. Schechter, and pursuant to 11 U.S.C. §363, Rule 4001 of the Federal Rules of Bankruptcy Procedure ("FRBP"), and Local Bankruptcy Rules 4001-2, and 9013-2, moves the Court for the entry of an order authorizing the Debtor to maintain and continue to operate under the pre-petition Factoring and Security Agreement[1] and continue to sell its accounts to OGF post-petition and grant OGF adequate protection in the form of replacement liens on accounts of the Debtor, pursuant to 11 U.S.C. §§ 361 and 363, retroactive to the date of filing, and in support thereof, states as follows:

### BACKGROUND

1.      The Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue of this case is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

---

[1] The Debtor is seeking approval to continue selling its accounts receivable pursuant to a Factoring and Security Agreement with OGF Capital LLC.

3.      The Debtor is an Illinois corporation that is engaged in the retail sale of building materials consisting of lumber, windows, doors, trim and hardware to commercial and residential builders.

4.      The Debtor remains in possession of its assets and continues to operate and manage its business as a "Debtor-in-Possession" under 11 U.S.C. §§1107 and 1108.

5.      OGF is in the business of providing accounts receivable financing and other forms of commercial financing for businesses.

6.      On or about September 17, 2025, OGF, as purchaser, and the Debtor, as seller, entered into a Factoring and Security Agreement ("Agreement") which entitled OGF to, among other things, purchase the Debtor's accounts arising from the Debtor's business. A true and correct copy of the Agreement is attached hereto as Exhibit A and made a part hereof.

7.      The Debtor and OGF operated under the Agreement prior to the Case.

8.      On or about November 5, 2021, the Debtor executed a promissory note in favor of Central Bank Illinois in order to borrow the principal sum of $300,000. The note is secured by security agreements dated October 29, 2020 and November 23, 2020, pledging all of the Debtor's assets including accounts receivable. The principal balance due under this note is $303,232.49. On or about November 8, 2021, the Debtor executed a promissory note in favor of Central Bank Illinois in order to borrow the principal sum of $175,000. The note is secured by security agreements dated October 29, 2020 and November 23, 2020, pledging all of the Debtor's assets including accounts receivable. The principal balance due under this note is $88,973.72.

9.      On or about January 27, 2025, Central Bank Illinois executed a subordination agreement in favor of Initium Specialty Finance, LLC ("ISP") subordinating its interest in future accounts receivable, payment intangibles and contract rights to ISP, the Debtor's prior factoring

2

lender. On or about September 18, 2025, OGF paid off ISP and succeeded to ISP's interest in future accounts. Likewise, on or about October 31, 2025, Central Bank Illinois executed a subordination agreement in favor of OGF subordinating its interest in future accounts receivable, payment intangibles and contract rights to OGF. A copy of the subordination agreement is attached hereto as Exhibit B and made a part hereof.

10.     Pursuant to the Agreement, in exchange for purchasing all of the Debtor's right, title and interest in and to the accounts purchased from the Debtor by OGF after the entry of the proposed order, OGF agrees to pay a purchase price to the Debtor which is the face amount of the purchased account.

11.     Pursuant to section 15 of the Agreement, the Debtor makes certain representations in respect to the purchased accounts it offers for sale to OGF, including, among others, that the Debtor has undisputed title and is the sole owner of each purchased account offered for sale and sold to OGF free and clear of any liens, security interests or encumbrances and each purchased account represents a bona fide existing obligation and is unconditionally owed and will be timely paid to OGF in full by an account debtor without any defense, dispute, offer, or counterclaim, and each account shall represent the Debtor's bona fide complete rendition of services in the ordinary course of the Debtor's business.

## JUNIOR INTEREST IN ACCOUNTS

12.     Based on the foregoing, the Debtor does not believe that any other party has an interest in the accounts receivable except for Central Bank Illinois which has subordinated its interest.

13.     As provided for in FRBP 4001(b)(1)(B) and (d)(1)(B), and pursuant to Local Bankruptcy Rule 4002-1, the Debtor intends to factor its accounts receivable with OGF pursuant

3

to the Agreement.

## RELIEF REQUESTED

14.     Pursuant to 11 U.S.C. §363(b)(1), the Debtor seeks authority to continue and maintain the pre-petition Agreement with OGF and allow the Debtor to sell its accounts receivable to OGF pursuant to the Agreement.

15.     The Debtor's ability to continue its operations by receiving working capital from OGF in the form of purchase price advances is necessary to avoid immediate and irreparable harm to the estate. The Debtor believes that it is essential that the Debtor be permitted to sell its accounts to OGF in order to continue its operations with the good faith expectation that it will achieve a successful reorganization.

16.     The Debtor has a reasonable and good faith belief that it is capable of successfully reorganizing. The Debtor's primary concern is to ensure that its business continues to move ahead as smoothly as possible during this Case. The Debtor's ability to obtain post-petition factoring facilities from OGF will allow the Debtor to continue operating so that it can continue with this reorganization process and propose a plan of reorganization. The Debtor's ability to convert its accounts receivable in exchange for immediate working capital is a critical need and key to the Debtor's success going forward.

WHEREFORE, the Debtor, North American Builders Supply, Inc., prays the Court enter an order authorizing the Debtor to continue and maintain the Factoring and Security Agreement in

4

order to sell its accounts to OGF, retroactive to the filing of the Case, and for such other and further

relief as this Court deems just and proper.

Respectfully submitted,

North American Builders Supply, Inc.,
Debtor

By:/s/ Joel A. Schechter__
     Its Attorney

Joel A. Schechter
Attorney No. 3122099
Law Offices of Joel A. Schechter
53 West Jackson Blvd.
Suite 860
Chicago, IL 60604
312-332-0267
joel@jasbklaw.com

5

# EXHIBIT A

## FACTORING AND SECURITY AGREEMENT

**THIS** FACTORING **AND SECURITY AGREEMENT** is made as of <u>9/17/2025</u> by and between NORTH AMERICAN BUILDERS SUPPLY INC. an Illinois Corporation("**Seller**") at 1111 S BRIDGE ST, YORKVILLE, IL 60560 and OGF Capital LLC, ("**Purchaser**") a New Jersey Limited Liability Company with an address for purposes of this Agreement at 151 County Rd 516, Suite 69, Old Bridge, NJ 08857.

1 - Definitions and Index to Definitions. The terms listed below shall be defined as follows. Any capitalized terms not defined here shall carry the meanings assigned to them in the Uniform Commercial Code:

- **ACH Authorization:** An automatic payment approval, in a form and content that is acceptable to the Purchaser at its sole discretion.

- **Active Account Debtor:** An Account Debtor of the Seller who has a Purchased Account owed to the Purchaser.

- **Affiliate:** In relation to any Person: i) Any other Person that directly or indirectly owns or controls the Person, any Person that controls, is controlled by, or is under common control with the Person, and each of that Person's senior executive officers, directors, partners, and for any Person that is a limited liability company, that Person's managers and members; or
  ii) Any Person that is more than 20% owned by another Person who also owns or controls a third Person, or where a common Person manages the daily operations of both the first Person and a third Person.

- **Avoidance Claim:** Any claim that a payment received by the Purchaser can be avoided under the Bankruptcy Code or any other debtor relief law.

- **Bank Account:** A deposit account at the Seller's Bank set up for depositing all proceeds from Accounts owed by Non-Notified Payors.

- **Business Day:** A day when banks are operational in the Chosen State.

- **Chosen State:** New Jersey.

*PM*

Initial

- Clearance Days: Three Business Days for checks drawn on banks within the Chosen State, three days for electronic funds transfers, and five Business Days for all other payments.

- **Closed:** A Purchased Account is considered closed when the Purchaser receives full payment from a Payor or from the Seller (including charging it to the Reserve Account).

- **Collateral:** All of the Seller's current and future Accounts, Chattel Paper, Inventory, Equipment, Instruments, Investment Property, Documents, Letter of Credit Rights, Commercial Tort Claims, Deposit Accounts, General Intangibles, Supporting Obligations, books and records, and their Proceeds.

- **Complete Termination**: Occurs when the following conditions are met:
  1. Full payment of all Obligations of the Seller to the Purchaser;
  2. If the Purchaser has issued or caused to be issued guarantees, promises, or letters of credit on behalf of the Seller, acknowledgment from any beneficiaries that the Purchaser or any other issuer has no outstanding direct or contingent liability;
  3. The Seller and all Guarantors of the Obligations have signed and delivered to the Purchaser and its successors and assigns a general release in a form and substance satisfactory to the Purchaser at its sole discretion.

- **Credit Limit:** For each Account Debtor, the "Credit Limit" specified in the Credit Notice in effect as of the determination date.

- **Credit Notice:** A notice issued upon the approval of any receivable by the Purchaser, defining the Reserve Percentage and credit limit.

- **Deposit Account Control Agreement:** An agreement among the Seller, Purchaser, and Seller's Bank, in a form and substance acceptable to the Purchaser, which, among other things, states that (i) the Purchaser has control of the Bank Account and (ii) the Seller's Bank agrees to sweep daily, or as often as the Purchaser specifies, all funds in the Bank Account to an account designated by the Purchaser or its assignee.



Initial

- **Eligible Account:** An Account that the Purchaser deems acceptable for purchase, based on reasonable credit or business judgment.

- **Exposed Payments:** For (i) a Recourse Account that the Seller has repurchased or could be required to repurchase, or (ii) a Non-Recourse Account that the Seller has repurchased or could be required to repurchase, payments received by the Purchaser from or on behalf of a Payor who has entered bankruptcy proceedings, to the extent such payments cleared the Payor's deposit account within ninety days of the bankruptcy case's commencement.

- **Face Amount:** The amount due on an Account at the time of purchase.

- **Factoring Fee:** The Factoring Fee Percentage multiplied by the Face Amount of a Purchased Account, for each Factoring Fee Period or portion thereof that any portion remains unpaid, calculated from the Purchase Date to and including the date a Purchased Account is Closed, always subject to a minimum of 4.0% for each Purchased Account, regardless of the date the Purchased Account is Closed.

- **Factoring Fee Percentage:** As specified below: 0.135%.

- **Factoring Fee Period:** 1 DAY.

- **Initial Term:** A one-year period, starting from the date the Purchaser first purchases an Account under this agreement.

- **Insolvency Date:** The date the Purchaser reasonably determines that an Account Debtor has become Insolvent, following an assertion to that effect by the Seller to the Purchaser.

- **Insolvency Loss:** For each Purchased Account, the sum of:
  1. The product of the Face Amount of the Purchased Account multiplied by the difference between 100% and the Reserve Percentage; minus
  2. The amount by which the unpaid Face Amount of the Purchased Account exceeds the Credit Limit (as reduced by payments made by the Account Debtor on the Purchased Account) applicable to the



Initial

Account Debtor obligated on the Purchased Account on the Insolvency Date.

- **Insolvency Proceeding:** For an Account Debtor:
    1. A voluntary or involuntary petition for relief under Title 11 (including Chapters 7, 11, and 13) of the United States Bankruptcy Code is filed by or against the Account Debtor;
    2. A receiver is appointed for all or any part of the entity's property;
    3. The Account Debtor, or a third party on behalf of the Account Debtor, makes a general written offer of compromise to all of its creditors for less than its indebtedness;
    4. The Account Debtor's assets are taken over under an assignment or deed of trust executed by the Account Debtor for the benefit of its creditors;
    5. A creditors' committee is formed solely for liquidation purposes;
    6. The Account Debtor's business assets are taken over under a chattel mortgage;
    7. The Account Debtor's assets are sold under a writ of execution or attachment, or a writ of execution is returned unsatisfied;
    8. The Account Debtor files an Assignment and/or makes a proposal to creditors under the Canadian Bankruptcy and Insolvency Act;
    9. A voluntary or involuntary petition for relief under the Companies Creditors Arrangement Act in Canada is filed by or against the Account Debtor;
    10. A receiving order is made against the Account Debtor under the Canadian Bankruptcy and Insolvency Act; or
    11. The Account Debtor's assets are sold under the Canadian Bank Act, or a judgment ordering liquidation or repossession of the Account Debtor's assets is issued due to a trust deed, commercial pledge, or moveable hypotheque under the laws of each province or territory in Canada.

- **Insolvent:** An Account Debtor is considered Insolvent if it fails to pay a Purchased Account solely due to its financial inability to pay the specific Purchased Account on the due date ("Due Date"). The burden of proof of an Account Debtor's insolvency rests solely on the Seller, with the presumption that on the Due Date, the Account Debtor was not Insolvent.

Initial

- **Invoice:** The document or other Record that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

- **Misdirected Payment Fee:**
  1. 30% of the amount of any payment (but in no event less than $1,000) on account of any Account received by the Seller (other than payments made to the Bank Account by a Non-Notified Payor) or a third party and not paid by the Seller to the Purchaser within 72 hours following the date of receipt by the Seller or the date the Seller becomes aware of receipt by such third party; or
  2. 45% of the amount of any such payment received by the Seller (other than payments made to the Bank Account by a Non-Notified Payor) or any third party as a result of any action taken by the Seller to cause such payment to be made to the Seller or any third party.

- **Monthly Administration Fee:** A monthly fee of US$250, payable by the Seller to the Purchaser.
- **DACA Account Monthly:** $350
- **PO Financing:** 2.5% a week / 5% minimum
- **Non-Notified Payor:** A Payor to whom the Purchaser has not sent a Notice of Assignment.
- **Notice of Assignment:** A notice, in a form acceptable to the Purchaser at its sole discretion, sent by the Purchaser to a Payor informing them that payments on the Seller's Accounts must be made to the Purchaser or its assignee.

- **Notified Payor:** A Payor to whom the Purchaser sends a Notice of Assignment.

- **Obligations:** All present and future obligations owed by the Seller to the Purchaser, whether arising under this agreement, related documents, instruments and agreements, or otherwise, and whether arising before, during, or after the commencement of any bankruptcy case in which the Seller is a debtor.

- **Parties:** The Seller and the Purchaser.

⌐ ̈PM̄

Initial

Page 5 of 49

- **Payor:** An Account Debtor or other obligor on an Account, or an entity making payment on behalf of such party.

- **Person:** Any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity, or government agency.

- **Purchase Date:** The date on which the Purchaser pays the Purchase Price of a Purchased Account, whether by a credit to the Reserve Account or by a deposit or transfer to a demand deposit account of the Seller.

- **Purchase Price:** The Face Amount of a Purchased Account.

- **Purchased Accounts:** Accounts purchased under this agreement that have not been Closed.

- **Recourse Accounts:** Accounts purchased by the Purchaser for which the Seller assumes the credit risk and credit loss for an unpaid Account.

- **Renewal Term:** 1 year.

- **Repurchased Account:** An Account that has been repurchased by the Seller by payment to the Purchaser of the then unpaid Face Amount.

- **Required Reserve Amount:** The Reserve Percentage multiplied by the unpaid balance of Purchased Accounts.

- **Reserve Account:** A bookkeeping account on the books of the Purchaser representing the portion of the Purchase Price that has not been paid by the Purchaser to the Seller, maintained by the Purchaser to ensure the Seller's compliance with the provisions of this agreement.

- **Reserve Percentage:** For Purchased Accounts owed by each Account Debtor, the "Reserve Percentage" listed in the Credit Notice in effect as of the date of determination.



Initial

- **Reserve Shortfall:** The amount by which the Reserve Account is less than the Required Reserve Amount.

- **Schedule of Accounts:** A form supplied by the Purchaser from time to time in which the Seller lists the Accounts it requests the Purchaser to purchase under the terms of this Agreement.

- **Seller's Bank:** The Seller's depository bank located in the United States, which is a party to a Deposit Account Control Agreement.

- **Seller's Deposit Accounts:** All present and future Deposit Accounts maintained by the Seller, including but not limited to any Deposit Account into which the Seller has instructed the Purchaser to wire funds.

- **Subordinate Lien Fee:** As of any date of determination, 10% of the aggregate Credit Limits as of such date.

- **Term:** The Initial Term or a Renewal Term, as applicable.

- **Termination Date:** The end of the last Term that was not extended under Section 21 hereof.

- **UCC:** The Uniform Commercial Code as adopted in the Chosen State.

- **Vendor Portal:** A Payor's online portal established for use by its vendors.

## 2. Sale; Purchase Price; Billing

- Assignment and Sale
  1. The Seller shall offer to sell to the Purchaser, as the absolute owner, with full recourse for Recourse Accounts and without recourse for Non-Recourse Accounts, such Accounts as are listed from time to time on Schedules of Accounts.
  2. Accounts will be purchased as Non-Recourse Accounts unless, at the time of purchase, the Purchaser indicates that an Account is ineligible for purchase as a Non-Recourse Account; in such cases, the Account shall be considered purchased as a Recourse Account under this agreement.



Initial

3. The Purchaser will inform the Seller in writing which of the Seller's Accounts have been purchased and which, if any, have been purchased as Recourse Accounts under this agreement.

4. Upon purchasing Non-Recourse Accounts, the Purchaser will assume the risk of non-payment on Purchased Accounts, up to the amount of the Insolvency Loss, provided that (i) the non-payment is solely due to the Account Debtor's insolvency, and (ii) the Account Debtor is not an Affiliate of the Seller.

5. Each Schedule of Accounts must be accompanied by the documentation supporting and evidencing the Account, as requested by the Purchaser from time to time.

6. The Seller must offer for sale to the Purchaser all Accounts owed to the Seller by an Active Account Debtor.

7. The Purchaser may, but is not obligated to, purchase from the Seller those Accounts it determines to be Eligible Accounts.

8. The Purchaser does not intend to purchase any Account that would cause the unpaid balance of Purchased Accounts owed by any Account Debtor to exceed the applicable Credit Limit for that Account Debtor.

9. Upon payment of the Purchase Price of any Purchased Account, less any amounts due to the Purchaser from the Seller, the Account shall be deemed purchased under this agreement. The payment of such Purchase Price shall serve as evidence of the purchase of the Purchased Account.

- Billing
  1. The Purchaser may send a monthly statement to each Notified Payor itemizing their account activity during the preceding billing period. All Notified Payors will be instructed to make payments to a Deposit Account designated by the Purchaser or its assignee, as specified in the Notice of Assignment.

- Credit Notices
  1. The Credit Limit and Reserve Percentage applicable to Purchased Accounts owed by any Account Debtor will be set forth in the initial Credit Notice sent by the Purchaser to the Seller.
  2. The Purchaser may, at any time and at its sole discretion, amend any Credit Limit and/or Reserve Percentage applicable to Purchased



Initial

Accounts owed by any Account Debtor by sending an amended Credit Notice ("Amended Credit Notice") to the Seller.

3. Upon sending an Amended Credit Notice, the Credit Limit and/or Reserve Percentage applicable to any Purchased Account owed by any Account Debtor, purchased after the date the Purchaser sends the Amended Credit Notice, shall be the Credit Limit and/or Reserve Percentage listed in the Amended Credit Notice.

## 3. Reserve Account

- The Seller shall pay to the Purchaser on demand the amount of any Reserve Shortfall.

- Except during any period when an Event of Default remains uncured, the Purchaser shall pay to the Seller any amount by which the Reserve Account exceeds the Required Reserve Amount ("Excess Reserves") on each Tuesday and Friday that is a Business Day.

- Upon termination of this Agreement or upon the occurrence of any Event of Default, whether or not cured or waived, these payments by the Purchaser to the Seller shall be made no more frequently than once a month.

- The Purchaser may charge the Reserve Account with any Obligation.

- The Purchaser may pay any amounts due to the Seller under this agreement by crediting the Reserve Account.

- The Purchaser may change the Reserve Percentage at any time upon five days' notice to the Seller, if the Purchaser determines, in its reasonable discretion, that such a change is justified based on considerations such as (but not limited to) changes in account dilution, payment practices of Account Debtors, or the credit quality of specific or general Account Debtors.

- With respect to each Non-Recourse Account (other than a Repurchased Account) owed by an Insolvent Account Debtor, within thirty days after the Insolvency Date, the Purchaser shall debit the Reserve Account with the product of:



Initial

Page 9 of 49

1. The Reserve Percentage; and
2. The Face Amount of such Purchased Account.

## 4. Exposed Payments

- Upon termination of this Agreement, the Seller shall pay to the Purchaser (or the Purchaser may retain) an amount equal to all Exposed Payments to hold in a non-segregated, non-interest bearing account (the "Preference Reserve").

- The Purchaser may charge the Preference Reserve with the amount of any Exposed Payments that the Purchaser pays to the bankruptcy estate of the Payor that made the Exposed Payment, due to a claim under Section 547 of the Bankruptcy Code.

- The Purchaser shall refund to the Seller, from time to time, the balance of the Preference Reserve for which a claim under Section 547 of the Bankruptcy Code can no longer be asserted due to the expiration of the statute of limitations, settlement with the bankruptcy estate of the Payor, or other reasons.

## 5. Authorization for Purchases

- Subject to the terms and conditions of this Agreement, the Purchaser is authorized to purchase Accounts based on telephonic, email, facsimile, or other instructions received from anyone claiming to be an officer, employee, or representative of the Seller.

## 6. Fees and Expenses

- Seller shall pay to Purchaser:
1. Factoring Fee: The Factoring Fee on the date a Purchased Account is Closed.
2. Misdirected Payment Fee: Any Misdirected Payment Fee immediately upon its accrual. It is understood that the costs incurred by the Purchaser due to the Seller's actions or inactions that lead to this fee are difficult to determine, and this fee represents a good faith effort to compensate the Purchaser without imposing the costly burden of litigating those costs. This fee is agreed upon as liquidated damages.



Initial

    3. Non-Payment Fee: Immediately upon recording by the Seller in its books and invoice management system an Account Debtor Invoice that the Seller decides not to sell to the Purchaser.

    4. Out-of-pocket Expenses: The out-of-pocket expenses directly incurred by the Purchaser in the administration of this Agreement, such as wire transfer fees $35, ACH $10, postage, and audit fees. Seller shall not be required to pay for more than four audits per twelve-month period.

    5. Monthly Administration Fee: The Monthly Administration Fee, payable on a monthly basis starting from the effective date of this Agreement.

## 7. Repurchase of Non-Recourse Accounts

- Seller shall repurchase, by paying the then unpaid Face Amount along with any unpaid fees related to the Purchased Account ("Repurchase Price"), on demand:

    1. Notwithstanding Insolvency: Despite an Account Debtor becoming Insolvent:

        (a) Any Purchased Account which is a Non-Recourse Account:

           (i) Where payment has been disputed by the Payor obligated on it, with Purchaser having no obligation to verify the legitimacy of the dispute;

           (ii) For which Seller has breached any warranty.

        (b) Purchased Accounts which are Non-Recourse Accounts upon the occurrence of an Event of Default, or upon the Termination Date.

    2. Absent Insolvency of an Account Debtor: If an Account Debtor has not become Insolvent by the Late Payment Date, any Purchased Account which is a Non-Recourse Account that remains unpaid beyond the Late Payment Date.

    3. On any Insolvency Date occurring before the termination of this Agreement, Purchaser shall credit the Reserve Account with the Insolvency Loss for a Repurchased Account for which the Seller has paid the Repurchase Price, where the Account Debtor has become Insolvent, other than a Non-Recourse Account which the Seller could be required to repurchase under this agreement.

## 8. Repurchase of Recourse Accounts

- Seller shall repurchase, by paying the then unpaid Face Amount along with any unpaid fees related to the Purchased Account on demand, or at Purchaser's option, by Purchaser's charge to the Reserve Account:



Initial

1. Any Purchased Account which is a Recourse Account, where payment has been disputed by the Payor or the Account Debtor obligated on it, with Purchaser having no obligation to verify the legitimacy of the dispute;
2. Any Purchased Account which is a Recourse Account for which Seller has breached any warranty.
3. Any Purchased Account which is a Recourse Account owed by an Account Debtor or Payor who (i) in Purchaser's reasonable credit judgment has become insolvent or (ii) has indicated an inability or unwillingness to pay the Purchased Account when due;
4. All Purchased Accounts which are Recourse Accounts upon the occurrence of an Event of Default, or upon the Termination Date of this Agreement;
5. Any Purchased Account which is a Recourse Account that remains unpaid beyond the Late Payment Date.

## 9. Security Interest

- As collateral securing the Obligations, with respect to the Collateral:
  1. Seller assigns it to Purchaser, and
  2. Grants Purchaser a continuing security interest in the Collateral.

## 10. Clearance Days

- For all purposes under this Agreement, Clearance Days will be added to the date on which Purchaser receives any payment.

## 11. Authorization to Purchaser

- Seller irrevocably authorizes Purchaser, at Seller's expense, to exercise at any time any of the following powers until all of the Obligations have been fully paid:

  1. Receive, take, endorse, assign, deliver, accept, and deposit, in the name of Purchaser or Seller, proceeds of any Collateral;
  2. Take or initiate, in the name of Purchaser or Seller, all steps, actions, suits, or proceedings deemed necessary or desirable by Purchaser to collect or otherwise realize upon Purchased Accounts;
  3. File any claim under (i) any bond or (ii) any trust fund with respect to any of the foregoing issued for the benefit of Seller individually or as a member of a class or group.



Initial

4. With respect to any credit insurance policy where Seller is an insured, in the name of Seller and/or Purchaser:
   (a) File a claim under the policy; and
   (b) Assign to the insurer any rights that Seller and/or Purchaser may have in Seller's Accounts, as required under the policy.

5. Pay any sums necessary to discharge any lien or encumbrance senior to Purchaser's security interest in any of Seller's assets and/or pay any obligations owed by Seller to a third party, including but not limited to Seller's subcontractors, sub-subcontractors, suppliers, and/or vendors for work performed or materials supplied in connection with a Job. These sums will be included as Obligations under this agreement, and the Late Charge will accrue and be immediately due and payable.

6. File, in the name of Seller or Purchaser or both:
   (a) Mechanics lien or related notices; or
   (b) Claims under any payment bond in connection with goods or services sold by Seller in connection with the improvement of real property.

7. Notify any Payor obligated with respect to any Account that the underlying Account has been assigned to Purchaser by Seller and that payment must be made directly to Purchaser or its assignee.

8. Communicate directly with Seller's Payors to verify the amount and validity of any Account created by Seller.

9. After an Event of Default:
   (a) Change the address for delivery of mail to Purchaser and receive and open mail addressed to Seller;
   (b) Settle Claims:
      (i) In its own name or on behalf of Seller, extend the payment time, compromise, or settle for cash, credit, return of merchandise, and on any terms or conditions any and all Accounts, and discharge or release any Account Debtor or other obligor, including filing any public record releasing any lien granted to Seller by such Account Debtor, without affecting any of the Obligations;
      (ii) All Settlements are presumed commercially reasonable, with the burden of proof on Seller.

10. File any initial financing statements and amendments that:

*PM*

Initial

(a) Indicate the collateral as all assets of the Seller or words of similar effect, regardless of whether any particular asset falls within the scope of Article 9 of the UCC, or with greater detail;

(b) Contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or acceptance of any financing statement or amendment, including (i) whether the Seller is an organization, the type of organization, and any organization identification number issued to the Seller and, (ii) in the case of a financing statement filed as a fixture filing or indicating collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the collateral relates; and

(c) Contain a notification that the Seller has granted a negative pledge to the Purchaser, and that any subsequent lienor may be interfering with Purchaser's rights;

(d) Advise third parties that any notification of Seller's Account Debtors will interfere with Purchaser's collection rights.

- Seller authorizes Purchaser to accept, endorse, and deposit on behalf of Seller any checks tendered by an Account Debtor as "full payment" of its obligation to Seller. Seller shall not assert any claim against Purchaser arising from such action, regardless of whether it results in an accord and satisfaction of Seller's claims, under §3-311 of the Uniform Commercial Code, or otherwise.

- Upon Seller's written request with respect to specific Account Debtors, and immediately after the occurrence of an Event of Default, Purchaser may, without Seller's request, perform Accounts collection services on Seller's behalf, which may include, but are not limited to: (1) communicating with Account Debtors, (2) reviewing public records and credit reports, and (3) initiating actions deemed appropriate by Purchaser to collect Seller's Accounts ("Collection Services"). Upon such request, or immediately after the occurrence of an Event of Default, Seller is deemed to have authorized Purchaser to perform Collection Services.

## 12. ACH Authorization

- To fulfill any Obligations, the Seller authorizes the Purchaser to initiate electronic debit or credit entries through the ACH system to any of the Seller's Deposit Accounts.

PM

Initial

**13. Covenants By Seller**

- Without the Purchaser's consent, the Seller shall not: (a) extend the payment period for any of its Accounts, (b) settle or compromise any of its Accounts for less than the full amount, (c) release any Payor in whole or in part, or (d) grant any credits, discounts, allowances, deductions, return authorizations, or similar adjustments with respect to any Accounts.

- Books and Records; Inspection; Audits
  1. The Seller shall always maintain complete, accurate, and current books and records, including a general ledger, subsidiary ledgers, cash receipts and disbursement journals, sales journals, and other records reasonably maintained by a business like the Seller, in accordance with the standards set forth in Section 727(a)(3) of the United States Bankruptcy Code.
  2. Upon request by the Purchaser, and at the sole expense of the Seller, the Purchaser shall have immediate access, during reasonable business hours before an Event of Default and at any time after an Event of Default, to all premises where Collateral is located for the purpose of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including the Seller's books and records. The Seller shall permit the Purchaser to make copies or extracts of such books and records as the Purchaser may request.
  3. The Seller irrevocably authorizes all accountants and third parties employed by the Seller to disclose and deliver to the Purchaser and its designees, at the Seller's expense, all financial information, books and records, work papers, management reports, and other information in their possession relating to the Seller.

- Before submitting any Invoice to:
  1. A Notified Payor, the Seller shall mark it with such notice of assignment as the Purchaser may require or, in the case of Invoices submitted on a Vendor Portal, the Seller shall enter, or cause to be entered, in the Vendor Portal an address or deposit account as directed by the Purchaser for payment on the Seller's Accounts;
  2. A Non-Notified Payor, the Seller shall mark it with instructions to make payments on the Account evidenced by such Invoice to the Bank Account, or, in the case of Invoices submitted on a Vendor Portal, the Seller shall enter, or cause to be entered, in the Vendor Portal the Bank Account as the deposit account for payment on the Seller's Accounts.


Initial

- The Seller shall instruct all Non-Notified Payors to make payments on all Accounts to the Bank Account and shall not change such instructions without the Purchaser's written consent.

- The Seller shall pay all payroll and other taxes when due and provide proof thereof to the Purchaser in such form as the Purchaser shall reasonably require.

- The Seller shall not create, incur, assume, or allow any lien on any assets that the Purchaser purchases or in which the Purchaser now or hereafter holds a security interest, except with the prior written consent of the Purchaser, which consent will not be unreasonably withheld as long as the subordinate secured party and Purchaser enter into a consent agreement acceptable to the Purchaser.

- Notwithstanding the Seller's obligation to pay the Misdirected Payment Fee, the Seller shall pay to a Deposit Account designated by the Purchaser or the Purchaser's assignee on the next banking day following the receipt by the Seller (other than payments made to the Bank Account by a Non-Notified Payor) the amount of:
  1. Any payment on account of a Purchased Account.
  2. After the occurrence of an Event of Default, any payment on account of any Account.

- The funds received by the Seller shall be held in trust for the Purchaser or the Purchaser's assignee, as applicable, and shall not be commingled with any funds of the Seller.

- Avoidance Claims
  1. The Seller shall indemnify the Purchaser and its successors and assigns from any loss arising out of the assertion of any Avoidance Claim, except for claims related to Purchased Accounts that are Non-Recourse Accounts owed by an Account Debtor that was Insolvent at the time the subject payment was received by the Purchaser, and shall pay the Purchaser on demand the amount thereof.
  2. The Seller shall notify the Purchaser within two Business Days of becoming aware of the assertion of an Avoidance Claim.



Initial

3. This provision shall survive the termination of this Agreement.

- If the Purchaser sends a Notice of Assignment to a Notified Payor obligated with respect to any Account, the Seller shall cooperate with the Purchaser concerning such notice and shall not direct such Payor to pay such Account to the Seller or any other entity or individual, or undermine or interfere with such Notice of Assignment in any manner.

- The Seller agrees that a violation that will put the value of the Collateral at risk and cause irreparable harm to the Purchaser. Therefore, the Purchaser shall be entitled to temporary and permanent injunctive relief to prevent such violation without needing to prove that actual damages are not an adequate remedy, and the Purchaser will be entitled to any proceeds of Accounts received by the Seller as a result of such violation.

- The Seller shall ensure that the Purchaser always has a list of all of the Seller's Deposit Accounts. Upon the Purchaser's request, the Seller shall cause the Purchaser to have control of any such Deposit Account (within the meaning of Section 9-104 of the UCC).

- The Seller shall provide the Purchaser and its successors and assigns with all necessary access codes, passwords, and login information to permit the Purchaser to access all Vendor Portals maintained by each of the Seller's Payors and shall use all commercially reasonable means to facilitate said access.

- On or before the date hereof, the Seller will cause the Seller's Bank to enter into the Deposit Account Control Agreement with the Seller and the Purchaser.

- Notify the Purchaser promptly in the event of a change in any and all shares, interests, participations, or other equivalents (however designated) in the capital stock or equivalent ownership interests in the Seller.

- The Seller shall deliver to the Purchaser (i) on or before the date hereof, an ACH Authorization with respect to all of the Seller's Deposit Accounts maintained by the Seller on the date hereof, and (ii) within two Business



Initial

Days of establishing a new Deposit Account after the date hereof, an ACH Authorization with respect to such new Deposit Account.

- The Seller shall, and shall cause its employees and officers to, comply with all state laws requiring any proceeds, funds, or payments received by the Seller from Jobs to be used to first pay the Seller's subcontractors, sub-subcontractors, suppliers, and vendors. The Seller acknowledges that the Purchaser is relying on such compliance when it receives any proceeds of Accounts or makes any payment to or for the benefit of the Seller under this Agreement.

- Upon the Purchaser's request, the Seller shall obtain or cooperate with the Purchaser to enable the Purchaser to obtain partial or final lien releases from the Seller's subcontractors, sub-subcontractors, suppliers, and/or vendors with respect to any Job.

**14. Account Disputes**
- The Seller shall promptly notify the Purchaser of all disputes concerning any Purchased Account, and only if requested by the Purchaser, will settle such disputes at the Seller's sole cost and expense. The Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute on terms the Purchaser, in its sole discretion, deems advisable, for the Seller's account and risk and at the Seller's sole expense. Upon the occurrence of an Event of Default, the Purchaser may Resolve such issues concerning any Account of the Seller. For the purposes of this Agreement, a "Dispute" shall refer to any claim, controversy, disagreement, or challenge raised by a third party relating to the validity, amount, payment, or performance of any Purchased Account.

**15. Representation and Warranties. The Seller represents and warrants that:**

- It is fully authorized to enter into this Agreement and perform hereunder;

- This Agreement constitutes its legal, valid, and binding obligation; and

- The Seller is solvent and in good standing in the jurisdiction of its organization.



Initial

- The Purchased Accounts are and will remain:

  1. Bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of the Seller's business to an Account Debtor that was not subject to an Insolvency Proceeding at the time such goods were delivered or such services were rendered;
  2. Unconditionally owed and will be paid to the Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation, other than Non-Recourse Accounts owed by an Account Debtor which was Insolvent.
  3. Not sales to any Affiliate of the Seller.
  4. "Arm's length" transactions.

- None of the Seller, any of its subsidiaries, any director or officer, or any employee, agent, or Affiliate of the Seller or any of its subsidiaries is a Person that is, or is owned or controlled by Persons that are: (i) the subject of any sanctions administered or enforced by the US Department of the Treasury's Office of Foreign Assets Control, the US Department of State, the United Nations Security Council, the European Union, His Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), or (ii) located, organized, or resident in a country or territory that is, or whose government is, the subject of Sanctions, including but not limited to Cuba, Russia, including the Crimea region of Ukraine, Iran, North Korea, Venezuela, Sudan, and Syria.

- None of the Seller or any of its subsidiaries, nor to the Seller's knowledge, any director, officer, agent, employee, Affiliate, or other person acting on behalf of the Seller or any of its subsidiaries, is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of any applicable anti-bribery law, including but not limited to, the United Kingdom Bribery Act 2010 (the "UK Bribery Act") and the U.S. Foreign Corrupt Practices Act of 1977 (the "FCPA"). Furthermore, the Seller and, to the Seller's knowledge, its Affiliates have conducted their businesses in compliance with the UK Bribery Act, the FCPA, and other applicable laws, rules, or regulations and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.



Initial

- The Seller has not received notice or otherwise learned of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Account Debtor concerning Purchased Accounts.

## 16. Indemnification

- The Seller agrees to indemnify the Purchaser against and hold Purchaser and its successors and assigns harmless from any and all suits, claims, liabilities, demands, damages, including special and consequential damages, and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), and any failure by the Seller to perform or observe its obligations under this Agreement.

## 17. Disclaimer of Liability

- The Purchaser will not be liable to, and shall not indemnify, the Seller for any lost profits, lost savings, or other consequential, incidental, or special damages resulting from or arising out of or in connection with this Agreement, the transactions or relationships contemplated hereby, or the Purchaser's performance or failure to perform hereunder, even if the Purchaser has been advised of the possibility of such damages.

## 18. Default

- Events of Default

  1. The following events will constitute an Event of Default hereunder:
     (a) The Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with the Purchaser, or any warranty or representation contained herein proves to be false in any way, however minor;
     (b) The Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings;
     (c) Any guarantor fails to perform or observe any of such guarantor's obligations to the Purchaser or notifies the Purchaser of its intention to rescind, modify, terminate, or revoke any guaranty of the Obligations,



Initial

or any such guaranty shall cease to be in full force and effect for any reason whatsoever;

(d) An order for relief is entered against any Seller and/or any guarantor by any United States Bankruptcy Court, or the Seller and/or any guarantor does not generally pay its debts as they become due (within the meaning of 11 U.S.C. 303(h) as at any time amended, or any successor statute thereto);

(e) The Seller and/or any guarantor makes an assignment for the benefit of creditors, or the Seller and/or any guarantor applies for or consents to the appointment of a custodian, receiver, trustee, or similar officer for it or for all or any substantial part of its assets, or such custodian, receiver, trustee, or similar officer is appointed without the application or consent of the Seller and/or any guarantor;

(f) The Seller and/or any guarantor institutes (by petition, application, answer, consent, or otherwise) any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, dissolution, liquidation, or similar proceeding relating to it under the laws of any jurisdiction, or any such proceeding is instituted (by petition, application, or otherwise) against the Seller and/or any guarantor;

(g) Any judgment, writ, warrant of attachment, execution, or similar process is issued or levied against a substantial portion of the property of the Seller and/or any guarantor;

(h) The Seller and/or any guarantor defaults in the performance of any obligations for the payment of money owed to any creditor;

(i) An adverse change occurs with respect to the financial condition or operations of the Seller that results in a material impairment of the prospect of repayment of the Obligations;

(j) The Purchaser, for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

- Waiver of Notice. PURCHASER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM THERETO.

- Effect of Default
  1. Upon the occurrence of any Event of Default:

$\boxed{PM}$

Initial

(a) The Purchaser may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable without notice (provided, however, that upon the occurrence of any Event of Default under clauses (d), (e), or (f) of Section 18, the Obligations shall automatically become due and payable without notice);

(b) The Late Charge shall accrue and is payable on demand on all Obligations.

## 19. Account Statements

- The Purchaser will provide the Seller with a statement, either in physical form or available online, detailing the transactions under this Agreement.

- Each statement will be deemed accurate and binding on the Seller as an account stated unless the Purchaser receives written notice from the Seller specifying any exceptions within sixty days after the statement is mailed or made available online. Any items not objected to within this period will be binding against the Seller.

## 20. Amendment and Waiver

- Any amendments to this Agreement must be in writing and signed by all parties involved. A delay or failure to exercise any right under this Agreement does not impair that right, nor does any waiver by the Purchaser constitute a waiver of any subsequent default or breach. The Purchaser's rights and remedies are cumulative and not exclusive of each other or any other rights or remedies available to the Purchaser.

## 21. Termination; Effective Date

- This Agreement will take effect on the date it is signed by the Parties and will continue for the Initial Term, automatically renewing for successive Renewal Terms.

- **Termination by Purchaser for Convenience**: The Purchaser may terminate this Agreement at any time, with or without cause, by providing the Seller with one month's prior written notice. The Agreement will terminate on the earlier of the specified termination date or the end of the current Term.

Initial

- **Termination for Cause:** Either Party may terminate this Agreement immediately upon written notice to the other Party if the other Party commits a material breach of any term of this Agreement and fails to cure such breach within thirty (30) days after receiving written notice specifying the breach in reasonable detail.

- A termination notice or notice of non-renewal will not be effective unless all Obligations have been paid to the Purchaser by the termination date specified.

## 22. No Lien Termination without Complete Termination
- Recognizing the Purchaser's right to have its attorneys' fees and other expenses and indemnification claims secured by the Collateral, the Purchaser will not be required to record any terminations or satisfactions of its liens on the Collateral until Complete Termination has occurred. The Seller acknowledges that this provision waives its rights under §9-513 of the UCC.

## 23. Conflict
- Unless expressly stated otherwise in any other agreement between the Purchaser and the Seller, if there is a conflict between the provisions of this Agreement and those of such other agreement, the provisions of this Agreement will prevail.

## 24. Severability
- If any provision of this Agreement is held to be invalid, illegal, or unenforceable, such provision will be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions will not be affected or impaired.

## 25. Relationship of Parties
- Despite the Purchaser having the rights of a Secured Party, the relationship between the parties will be that of a seller and purchaser of Accounts and not that of lender and borrower. Moreover, the Seller hereby represents and warrants that it is a large corporate entity, and is sophisticated in its understanding of the operations contemplated hereby, having sought the advice of counsel before executing this agreement.



Initial

- The Purchaser is not and will not be a fiduciary of the Seller, although the Seller may be a fiduciary of the Purchaser.

## 26. Attorneys' Fees

- The Seller agrees to reimburse the Purchaser on demand for the full actual amount of all costs and expenses, including attorneys' fees, which the Purchaser incurs in:

  1. Negotiating, preparing, or administering this Agreement and any related documents;
  2. Protecting, perfecting, preserving, or enforcing any lien, security interest, or other right granted by the Seller to the Purchaser or arising under applicable law, whether or not a suit is brought, including the defense of any Avoidance Claims;
  3. Enforcing this Agreement and any related documents, or in connection with any federal or state insolvency proceeding commenced by or against the Seller, including those arising out of the automatic stay, seeking dismissal or conversion of the bankruptcy proceeding, or opposing confirmation of the Seller's plan;
  4. Any federal or state insolvency proceeding commenced by or against the Seller, including those:
     (a) Arising out of the automatic stay,
     (b) Seeking dismissal or conversion of the bankruptcy proceeding, or
     (c) Opposing confirmation of the Seller's plan.

- If any Party finds it necessary to retain counsel to interpret, defend, or enforce this Agreement, including fees incurred in any appellate proceedings, the prevailing Party will recover its reasonable attorney's fees and expenses from the unsuccessful Party. It will be presumed (subject to rebuttal by competent evidence to the contrary) that the amount billed to the prevailing Party by its counsel is reasonable if based on the billing rates charged to the prevailing party by its counsel in similar matters.

- If the Seller asserts a claim against the Purchaser under this Agreement, it must do so in writing before commencing any litigation, specifying the amount of the Seller's claim against the Purchaser (the "Damage Claim"). If any dispute resolution process results in a judgment or award against the



Initial

Purchaser of less than the Damage Claim, the court is requested to find that the Purchaser was the prevailing party for the purposes of this Section.

**27. Entire Agreement**

- No promises of any kind have been made by the Purchaser or any third party to induce the Seller to execute this Agreement. No course of dealing, course of performance, or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

**28. Choice of Law**

- This Agreement and all transactions contemplated hereunder shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

**29. Jury Trial Waiver**

- To avoid the higher costs and delays of a jury trial, the parties waive any right to trial by jury of any claim, demand, action, or cause of action (a) arising hereunder, or (b) related to the dealings of the parties concerning this Agreement, whether sounding in contract, tort, or otherwise. Each party further waives any right to consolidate any such action with any other action in which a jury trial cannot or has not been waived. Each party consents that any such claim, demand, action, or cause of action shall be decided by court trial without a jury, and any party may file an original counterpart or a copy of this Section with any court as evidence of the consent of the parties to the waiver of their right to trial by jury.

**30. Venue; Jurisdiction**

- Any suit, action, or proceeding arising hereunder or related to this Agreement shall, if the Purchaser so elects, be brought in any competent state or federal court sitting in the State of New Jersey (the "Acceptable Forums"). The Seller agrees that the Acceptable Forums are convenient and irrevocably submits to the jurisdiction of the Acceptable Forums, waiving any objections to jurisdiction or venue.

- If any proceeding is initiated in another forum, the Seller waives any right to oppose any motion or application by the Purchaser to transfer such proceeding to an Acceptable Forum.



Initial

.

**31. Time of the Essence**

- Time is of the essence in all matters herein.

**32. Service of Process**

- The Seller agrees that the Purchaser may effect service of process upon the Seller by regular mail at the address provided herein or any other address reflected in the Purchaser's records, or at the Purchaser's option, by service upon the Seller's agent for service of process.

**33. Assignment**

- The Purchaser may assign its rights and/or delegate its duties hereunder. Upon such assignment, the Seller shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee, accepting performance by such assignee as if it were the Purchaser.

**34. Counterparts**

- This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were on the same document.

- Delivery of a signed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually signed counterpart of this Agreement. Any party delivering such a facsimile counterpart of the signature page to this Agreement shall also promptly deliver a manually signed counterpart to the other party. However, the failure to deliver such a manually signed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

**35. Notice**

- All notices required to be given to any party other than the Purchaser shall be deemed given upon the first occurrence of:
  1. Transmission by electronic means to a receiver under the control of such party, or
  2. Actual receipt by such party or an employee or agent of such party.

*PM*

Initial

- All notices to the Purchaser shall be deemed given upon actual receipt by a responsible officer of the Purchaser.

- For the purposes hereof, notices under this Agreement shall be sent to the following addresses, or to such other addresses as each party may in writing hereafter indicate.

SELLER: NORTH AMERICAN BUILDERS SUPPLY, INC

Address: 1111 S Bridge St., Yorkville, IL 60560
Director and President: Paul McCue
Email address: pmccue@nabsupply.com

Signature: _Paul McCue_

PURCHASER: OGF Capital LLC

Address: 151 County Rd 516, Suite 69, Old Bridge, NJ 08857

Operating Manager:     Kelly Damaris
Email address:     kellydamaris@ogfinancing.com

Signature: _Kelly Damaris_

Initial

Page 27 of 49

# EXHIBIT B

## SUBORDINATION AGREEMENT

*October 31, 2025*

*Central Bank Illinois*
*340 May Mart Dr.*
*Rochelle, IL 61068*

Re:   *NORTH AMERICAN BUILDERS SUPPLY INC.*

This subordination agreement ("Agreement") provides for a subordination of <u>*Central Bank*</u> <u>*Illinois's*</u> ("Secured Party") security interest in the present and future accounts, payment intangibles, and contract rights of <u>*North American Builders Supply Inc.*</u> (referred to as "Debtor") as follows:

NOTWITHSTANDING THE TERMS OR PROVISIONS OF ANY AGREEMENT OR ARRANGEMENT WHICH EITHER SECURED PARTY OR <u>OGF CAPITAL LLC (OGF)</u> MAY NOW OR HEREAFTER HAVE WITH THE DEBTOR OR ANY RULE OF LAW, AND IRRESPECTIVE OF THE TIME, ORDER, OR METHOD OF ATTACHMENT OR PERFECTION OF ANY SECURITY INTEREST OR THE RECORDATION OR OTHER FILING IN ANY PUBLIC RECORD OF ANY FINANCING STATEMENT, SECURED PARTY SUBORDINATES TO OGF LLC AND/OR ITS' ASSIGNS SECURED PARTY'S SECURITY INTEREST WITH REGARD TO ALL OF THE DEBTOR'S PRESENT AND FUTURE ACCOUNTS, PAYMENT INTANGIBLES, AND CONTRACT RIGHTS, INCLUDING ALL PURCHASED ACCOUNTS SOLD BY DEBTOR TO OGF UNDER THE FACTORING AND SECURITY AGREEMENT BETWEEN OGF AND DEBTOR (COLLECTIVELY, THE "OGF PRIORITY COLLATERAL"). SECURED PARTY FURTHER GRANTS OGF THE RIGHT TO AMEND SECURED PARTY'S FINANCING STATEMENT (UCC 1) FILED ON DEBTOR IN ILLINOIS, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A ("THE "UCC FILING"), IN ORDER TO ADD OGF AS A SECURED PARTY THERETO. IN THE EVENT THAT SECURED PARTY FILES A UCC CONTINUATION STATEMENT WITH RESPECT TO THE UCC FILING, IT IS ALSO DOING SO ON BEHALF OF AND WITH THE AUTHORIZATION OF OGF.

AS FURTHER INDUCEMENT FOR (OGF) TO ENTER INTO CERTAIN FUNDING ARRANGEMENTS WITH DEBTOR, SECURED PARTY HEREBY FORBEARS ANY ACTION WHATSOEVER THAT WOULD AFFECT OGF'S COLLECTION OF ALL OGF PRIORITY COLLATERAL. ANY PROCEEDS OF OGF PRIORITY COLLATERAL, OR PROCEEDS OF PROCEEDS, RECEIVED BY SECURED PARTY SHALL BE, IMMEDIATELY UPON DISCOVERY, PAID TO OGF.

Secured Party shall not, at any time while this Agreement is in effect, assign any of the obligations owing by Debtor to Secured Party secured by the OGF Priority Collateral to any entity which does not agree in a writing, satisfactory in form and substance to OGF, to be bound by all of the promises and obligations of Secured Party hereunder.

This Agreement shall be governed by the laws of the State of Illinois and constitutes the entire agreement and understanding of Secured Party and OGF with respect to its subject matter and

BN 80963994v2

supersedes all oral communications and prior writings with respect thereto. No amendment or waiver of any provision of this Agreement or any consent to any departure by Secured Party and OGF shall in any event be effective unless in writing and signed by both Secured Party and OGF.

Please sign below confirming such agreement.

By: _Kelly Damaris_
Kelly Demaris, Operating Director

OGF CAPITAL LLC (OGF)

OGF    CAPITAL    LLC    (OGF)
151 County Road 516, Suite 69 Old Bridge, NJ 08857.

**Agreed and understood:**
**SECURED PARTY**

**Agreed and understood:**
**DEBTOR**

Name: _BRUCE SELDAC_          Name: _Paul J. McCue_
Signature: _____          Signature: _____
Title: _Senior Vice President_   Title: _PRESIDENT_

BN 80963994v2